IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TENNESSEE

WESTERN DIVISION

_____

BARTON THORNE,

                 Plaintiff,

vs.                               NO. 2:21-cv-02110

SHELBY COUNTY BOARD OF EDUCATION,

                 Defendant.

_____

MOTION HEARING

BEFORE THE HONORABLE MARK NORRIS, JUDGE

THURSDAY

17TH OF FEBRUARY, 2022

LISA J. MAYO, RDR, CRR
OFFICIAL REPORTER
FOURTH FLOOR FEDERAL BUILDING
MEMPHIS, TENNESSEE 38103

**UNREDACTED TRANSCRIPT**

2

1                      A P P E A R A N C E S

2

3

4

5    Appearing on behalf of the Plaintiff:

6              MR. DANIEL ROBERT SUHR
               National Center for Justice and Liberty
7              747 N. Jackson Street, Suite 210
               Chicago, Illinois 60654
8              Phone: (414) 588-1658

9              MR. CAMERON M. WATSON
               Spicer Rudstrom, PLLC
10             6060 Primacy Parkway, Suite 401
               Memphis, Tennessee 38119
11             Phone: (901) 523-1333

12

13   Appearing on behalf of the Defendant:

14             MS. JAMIE MORTON
               MR. KENNETH WALKER, II
15             Shelby County Board of Education
               160 S. Hollywood Street, Room 218
16             Memphis, Tennessee 38112
               Phone: (901) 416-6370

17

18

19

20

21

22

23

24

25

**UNREDACTED TRANSCRIPT**

                                                                    3

1                              THURSDAY

2                           February 17, 2022

3                      ----------------------

4

5           **THE COURT:**  You may notice that I am not wearing

6    a facial covering.  That is because we are back to a point,

7    apparently, where if you're fully vaxxed and boosted and

8    would feel more comfortable not wearing a face covering under

9    these circumstances with so few folks present, you may feel

10   free to unveil and not wear a face covering.  But even if you

11   are vaxxed and boosted and feel more comfortable doing so,

12   you may feel free to do that as well.

13           However, if you are not vaxxed and boosted, then

14   we ask that you please do remain covered as you all are.  Any

15   questions?  I can't see if you're smiling.

16           We're here, at the Court's request, in Barton

17   Thorne versus Shelby County Board of Education and Dr. Joris

18   Ray in his official capacity.  There's no individual

19   complaint against Dr. Ray; isn't that correct?

20           **MR. SUHR:**  Yes, Your Honor, no individual.

21           **THE COURT:**  And if you would, just introduce

22   yourselves to the Court, and then we'll have some discussion

23   about the pending motion to dismiss.  Yes, sir.

24           **MR. SUHR:**  Good morning.  Nice to be with you in

25   person this time.  Daniel Suhr on behalf of Principal Thorne.

                        **UNREDACTED TRANSCRIPT**

1          **MR. WATSON:**  Cam Watson on behalf of Principal

2    Thorne.

3          **THE COURT:**  All right.  Nice to have both of you

4    here.  Thank you, Mr. Suhr and Mr. Watson.

5          And for Shelby County Schools?

6          **MR. WALKER:**  Good morning, Your Honor.  I'm

7    Kenneth Walker, here on behalf of Shelby County Board of

8    Education and Dr. Joris Ray in his official capacity.

9          **MS. MORTON:**  Jamie Morton here on behalf of both

10   defendants.

11         **THE COURT:**  It is nice to have all of you here in

12   person.

13         Obviously pending before the Court is now Memphis

14   Shelby County Schools' motion to dismiss.  And I know that

15   Shelby County Schools referred to the local rule that

16   requires a defendant, in asking for an oral argument, to be

17   specific as to why that's necessary.  And actually even

18   though that was referenced, I did this because I wanted to

19   find out why it's necessary on a couple of different levels.

20         Do I remember correctly that we've received word

21   from the mediator that nothing came of that?  Am I right

22   about that?

23         **MS. MORTON:**  That's correct.

24         **THE COURT:**  I didn't have a chance to look back,

25   but my recollection was they said that was a nonstarter.  And

1    I'm trying to be open with you all about how best to proceed

2    with this.  The issues have been well briefed as far as it

3    goes by the schools.  And on behalf of Principal Thorne,

4    there's a -- a lot of spaghetti has been thrown against the

5    wall here, and it's important spaghetti.  First amendment and

6    14th we hold inviolate very important principles.

7            Oftentimes I think because of the structure of

8    the analysis and the law in the Sixth Circuit, it may appear

9    that the Court's indifferent.  This Court's not indifferent

10   at all to the plaintiff's plight, so to speak.  But at the

11   same time, there are certain guardrails that, at least in the

12   Sixth Circuit, have been established, and at the lowly

13   district court level we have to keep it in the middle of that

14   road.

15           The Sixth Circuit may look at this differently,

16   the issue of free speech, due process, but free speech in the

17   education setting has had a number of different cases,

18   different variations on whether it was a student or a

19   teacher, whether it was on campus or off campus, whether it's

20   a grade school, a high school, a college or university.  And

21   the defendants in this case have set forth the authorities

22   that are pretty straightforward in terms of what the district

23   court's analysis should follow.

24           I guess it's in your Footnote 5.  I'll look and

25   see if I can put my fingers on that, Mr. Suhr, that you

**UNREDACTED TRANSCRIPT**

1 | said --

2 |             **MR. SUHR:**  He doesn't overrule the due process

3 | analysis.

4 |             **THE COURT:**  Yeah, you phrased it in a particular

5 | way that I want to make clear I'm not -- I didn't call you

6 | all in here today -- there we go -- because I necessarily

7 | decided how to rule.  I forget how you phrased it.  Here we

8 | go:  If the Court finds that *Garcetti* and *Evans-Marshall* do

9 | control.

10 |             I mean the law is the law, and *Evans-Marshall*

11 | looms large here, so you said you reserve the right to argue

12 | *Garcetti's* exception for teaching and scholarship applies to

13 | educators, et cetera, et cetera.  I guess I'd like to hear

14 | from you about that because it's not easy to see under the

15 | circumstances what exception you might create to get around

16 | *Evans-Marshall* here.  You talk about *Meriwether*, talk about

17 | what you will.  So I want to get there.

18 |             I also am mindful of the Court's responsibilities

19 | under Article III about jurisdiction which is not something

20 | anybody has raised, but I'm duty bound to be the gatekeeper

21 | if others aren't.  And I know there have been -- I asked

22 | Mr. Suhr, I think, in our scheduling conference about the

23 | damages aspect, and he was quick to respond about nominal

24 | damages, and more recent case law makes clear that they may

25 | suffice.

**UNREDACTED TRANSCRIPT**

1          Other case law, more recent case law, also

2     addresses, as I remember, psychic or psychological injury

3     isn't necessarily a nonstarter, a may suffice, but I'm still

4     somewhat in doubt about, under even more recent authority,

5     whether there is sufficient injury, something more than what

6     would require me or this Court to speculate, and I want to

7     explore that a little bit and also the issue of

8     redressability.

9          Because I understand when the schools put this

10    letter in Principal Thorne's file, all of this had to be

11    reported, and I'm going to want to hear from Memphis Shelby

12    County Schools about the procedure and the protocol that's

13    filed when one is suspended with or without pay -- I know he

14    was with pay in this case -- what state law requires you to

15    do in the way of reporting to the State Board of Education

16    and what records are maintained there.  And you put the

17    letter in his file with this -- it's like no violation, come

18    back to work.  I know there's an issue about six weeks and

19    whether that was reasonable, but this admonition that he be

20    mindful of how his remarks may affect school staff and

21    students and encourage him to participate in professional

22    development on methods to ensure the school environment

23    remains optimal for student learning.

24         So it's like he didn't do anything wrong but he

25    did something wrong.  And that goes to the state and that's a

1  record up there.

2          If I -- if I granted the plaintiff's relief this

3  morning, overruled your motion to dismiss, State of Tennessee

4  is not a defendant in this action.  I mean, where is the

5  redressability?  The record is still up there.  It's still --

6  the harm, if any, has still been done.

7          So I've got issues about jurisdiction in the

8  first instance.  I'm just not really sure this Court has

9  jurisdiction of this claim given what's alleged.

10          So having said that, why don't I begin with

11  Mr. Thorne's counsel to see where you would like to begin

12  with the question.

13          **MR. SUHR:**  Do you mind if I move to the podium,

14  Your Honor?

15          **THE COURT:**  You can move to wherever you're most

16  comfortable.

17          I also want counsel for the Memphis Shelby County

18  Schools to be thinking about the initial question which is

19  why is this necessary at all under the circumstances.  I

20  mean, we all do lots of important things, and nothing is more

21  important than the defendant's constitutional rights here.

22  But it looks like this would be a very -- a relatively simple

23  case to resolve to everyone's satisfaction.  That's just on

24  my mind.

25          Back to the local rule and why it's necessary to

**UNREDACTED TRANSCRIPT**

1    be here, I wanted you here because I wanted to see you.  I

2    wanted to discuss this because I want to make sure the time

3    we're devoting to it is worth everyone's while.

4            Okay, Mr. Suhr?

5            **MR. SUHR:**  Thank you, Your Honor.  And

6    plaintiffs are -- plaintiff is certainly open to settlement

7    discussions in the future.  Let me try to untangle my

8    spaghetti.

9            **THE COURT:**  Okay.

10            **MR. SUHR:**  So for me, I think this case comes

11    down to two cases for defendants and two cases for

12    plaintiffs.

13            **THE COURT:**  Thank you.

14            **MR. SUHR:**  The two cases for defendants are

15    obviously *Garcetti* and *Evans-Marshall*.  I think *Garcetti*

16    stands for the very reasonable and correct proposition that

17    the government may direct the speech of its employees.  I

18    think *Evans-Marshall* stands for the proposition that K-12

19    teachers don't have academic freedom.  There may be a circuit

20    split on that.  That's Footnote 5.  But that, you're correct,

21    is for a future day.

22            I think our two cases and the important two cases

23    for plaintiff are *Dambrot versus Central Michigan University*

24    and *Meriwether versus Hartop*.  So *Dambrot*, you may recall, is

25    a 1995 case involving CMU and a decision to suspend a coach

**UNREDACTED TRANSCRIPT**

1  who uses racially offensive language in the locker room.  And

2  he challenges that saying I was not on fair notice under the

3  university's policies that this would -- that this speech

4  that I gave in the locker room would violate the university's

5  policies and that these policies are void for vagueness, that

6  they use these big broad phrases like offensive, and I'm not

7  on fair notice that what I said would be offensive.

8          We can argue whether or not racial slurs are

9  offensive, but the Sixth Circuit said that he was not on fair

10  notice and that the university's policy was void for

11  vagueness as applied to him and that that violated his 14th

12  Amendment due process rights with a little bit of First

13  Amendment free speech kind of sprinkled on top.  But

14  fundamentally, it's a fair notice, due process, void for

15  vagueness claim.

16          So I think the defendant would come back and say,

17  well, that's pre-*Garcetti*.  That's 1995, that's pre-*Garcetti*.

18  Now we have clarity that we have greater control over

19  employees and what they can say.  And I don't think that's

20  right.  And the reason I don't think that is right is the

21  Sixth Circuit's decision in *Meriwether*.  This is the

22  professor at the community college who has asked to use the

23  pronouns, right?

24          In the first section of that case, the Sixth

25  Circuit spends an extended discussion on *Garcetti*.  At the

**UNREDACTED TRANSCRIPT**

1    end of that decision, though -- there's the first section on

2    *Garcetti* and then there's a middle section on free exercise.

3    The last claim is a void for vagueness claim.  He says that I

4    was not on fair notice that the university policy would lead

5    to my punishment for not following the preferred pronouns.

6              And the Sixth Circuit, having just gone through

7    all this analysis of *Garcetti,* then goes through all the

8    normal analysis for a void for vagueness policy as applied to

9    a public employee.  At no point does the Sixth Circuit say,

10   well, that void for vagueness stuff, that's all pre-*Garcetti*;

11   *Dambrot's* out the window.  In fact, the Sixth Circuit relies

12   on *Dambrot* and says that this is a principle that you have to

13   say with clarity what you expect your employees to say.  And

14   if you don't and you punish them for it, it violates their

15   rights.

16             **THE COURT:**  Mr. Suhr, your position is that

17   that's regardless of whether we're dealing with a high school

18   teacher --

19             **MR. SUHR:**  Correct.

20             **THE COURT:**  -- or college or university, even

21   though *Meriwether* is all about the college and university

22   level?

23             **MR. SUHR:**  So I would say the first section of

24   *Meriwether* dealing with academic freedom is about the college

25   and university level.  The third section of *Meriwether*

dealing with the void for vagueness claim is applicable to

any public employee.  I don't even think it's specific to the

education context.  It basically just says if a public

employer wishes to discipline a public employee for speech,

they need to be really clear in their policies about what

those rules are.

I shouldn't even say really clear.  Like, I

recognize, and SCS, I think, is correct that  a government

employer clearly has more flexibility in regulating its

employees than it does an average citizen.  But even still,

*Dambrot* says and *Meriwether* confirms they have to give fair

notice that a person of ordinary and reasonable intelligence

would read the public employer's policy and know what is and

is not prohibited.

And I just don't think there's any way Barton

Thorne could read the staff ethics policy for 4002 and say,

gee, teaching in line with Tennessee social studies standards

is going to be a violation of 4002.  He's just not on fair

notice.  And I think that is our strongest claim.  That's one

that the Court doesn't have to reach any of these other

interesting academic questions about academic freedom.  It's

a simple holding to say, *Dambrot* is still good law, see

*Meriwether.*  And *Dambrot* says you have to speak with clarity

as public employer in your ethics policies, especially when

you regulate speech.

**UNREDACTED TRANSCRIPT**

1          **THE COURT:** He wasn't determined to have violated

2   any policy, correct?

3          **MR. SUHR:** The morning that we filed this

4   lawsuit, Your Honor, he got a phone call -- I got a phone

5   call, he got a phone call, his wife got a phone call, and

6   then he received the letter of warning that allowed him to

7   return to his job, and then that letter was placed in his

8   file.

9          **THE COURT:** All right. So you're focusing on the

10  process claim?

11         **MR. SUHR:** Yes. So I think our cleanest,

12  clearest, and strongest claim is the 14th Amendment void for

13  vagueness due process claim.

14         **THE COURT:** All right.

15         **MR. SUHR:** And there I really think if Your Honor

16  takes the time to read *Dambrot* and then to read the third

17  section of *Meriwether*, I think those two cases lay out the

18  chart -- chart the course very clearly.

19         **THE COURT:** I know discovery cutoff is soon.

20  Tomorrow?  Tomorrow.

21         **MR. SUHR:** Tomorrow.

22         **THE COURT:** What discovery have you all engaged

23  in?

24         **MR. SUHR:** We have an expert witness, Your Honor,

25  who testified to the social studies curriculum that is the

**UNREDACTED TRANSCRIPT**

Tennessee social studies standards and kind of national

social studies curriculum.  So she has an expert report, and

she has been deposed by the defendants.

Principal Thorne sat down and did a deposition.

And then we've exchanged, I think, probably several hundred

documents at this point, probably under a hundred on our side

then well over a hundred on the school side.

**THE COURT:**  And have you received from SCS your

client's contract?  They seem to have made some fuss about

whether -- the inference is that there's not sufficient proof

of breach of contract or something.  Where are you on all

that?  I can ask SCS as well, but --

**MR. SUHR:**  I don't remember offhand, Your Honor.

**THE COURT:**  All right.

**MR. SUHR:**  I do know it's an adhesion contract.

It's a standard contract that they use across the system.  As

I understand it, it's an electronic contract.  You basically

click in and click for the year that you sign and accept.

And that it's just a standard form contract.  We attached a

copy of what we believe the standard form contract is to our

complaint.

**THE COURT:**  And has whatever discovery you've

taken revealed whether, as I think was alleged, members of

the superintendent's cabinet were personally involved in the

suspension in any way?  Was there any more developed on that?

**UNREDACTED TRANSCRIPT**

1          **MR. SUHR:**  I mean, there's a number of documents

2    that have been exchanged obviously.  I think the members of

3    the superintendent's cabinet were included in the documents

4    that we've received.  Obviously, we're here on a motion to

5    dismiss, and in our complaint we're, I think, pretty specific

6    about the members of his administration and what we've

7    alleged that would be assumed true at this point.

8          **THE COURT:**  And as we all know, plausibility is

9    one of the considerations, but I would think here on the eve

10   of the closing of discovery that some of that might have been

11   developed that could have been of some benefit to my

12   thinking, but that's fine.  One of the Court's questions goes

13   to plausibility, is whether Mr. Thorne was suspended for a

14   purpose other than to allow his employer to conduct a timely

15   internal investigation into his alleged wrongdoing.  You've

16   complained about the time it took.  And I will also ask

17   counsel for the schools about that, but articulate your

18   position for that.

19         **MR. SUHR:**  Yeah, absolutely, Your Honor.  Again,

20   at this stage, accepting the complaint as true, what we have

21   said is that he was suspended the day -- actually, in

22   discovery some of the documents have come out.  You know, he

23   gets an e-mail from the Office of Professional Standards

24   saying report to the main downtown office building right away

25   and then is suspended.

**UNREDACTED TRANSCRIPT**

1         In the complaint we allege that he received

2    several phone calls and contacts early on from the Office of

3    Professional Standards saying, oh, this should be a quick,

4    easy no-brainer, and then nothing, radio silence.  And that

5    he's sitting at home on suspension.  He's not asked to

6    provide, you know, documents.  There's no evidence that we

7    have in the complaint that there's any active investigation

8    going on, and then the morning the complaint is filed he

9    receives this phone call saying please return to work.

10         And so what we have alleged in the complaint,

11    which again we should accept as true here, is that there's an

12    ulterior motive that this is getting caught up in politics at

13    the school district and the school board level.  Part of why

14    we know that is that one of the school board members speaks

15    out in the media about his case.  And so our allegation in

16    the complaint is that this was not a true internal

17    investigation in a traditional sense.

18         Honestly, there's nothing to investigate.  They

19    had the transcript.  They had the three complaints that were

20    filed against him from members of the school community, and

21    it is what it is on its face, right?  So we believe it was

22    other things driving his suspension.

23         **THE COURT:**  All right.  You may not be off the

24    hook, but I do want to ask counsel for SCS --

25         **MR. SUHR:**  If I may -- sorry.  Just quick on

**UNREDACTED TRANSCRIPT**

1    redressability --

2         **THE COURT:**  Yes.

3         **MR. SUHR:**  -- and jurisdiction since we just

4    talked about the merits for a while?  So I think the nominal

5    damages claim at minimum, given the Georgia Gwinnett case

6    from the Supreme Court last term -- it's the one that starts

7    with a U letter that nobody can pronounce.

8         **THE COURT:**  I have that.

9         **MR. SUHR:**  Yep.  So I think that is very clear.

10        **THE COURT:**  It's clear in terms of theory that

11   nominal damages may suffice, but what's the damage here?

12   What in fact?

13        **MR. SUHR:**  The damage is the chill to Principal

14   Thorne's speech by the violation of his 1st and 14th

15   Amendment rights.  I think just the violation of his 14th

16   amendment rights in and of themselves, like just the

17   violation of his constitutional right, is a nominal damages

18   violation.

19             In other words, if on summary judgment we win

20   what I have proposed that *Dambrot* and *Meriwether* mean what I

21   think they say, that alone is nominal damages.  And then,

22   you're right, Your Honor, about the warning letter in his

23   file going to the State and the State not being a defendant,

24   but that file also exists at Shelby County Schools.  And as I

25   understand it, that is a publicly-available file, and so they

**UNREDACTED TRANSCRIPT**

```
 1   could withdraw the letter at minimum from their own files and
 2   no longer have that be part of his personnel record.
 3            THE COURT:  It would still be part of the State's
 4   files and their public record as well.
 5            MR. SUHR:  That is true, Your Honor.  I suppose
 6   we could always amend our complaint to ask as part of our
 7   injunctive relief that they withdraw the letter from the
 8   State which I imagine they have the power to do.
 9            THE COURT:  It'd be too late.
10            MR. SUHR:  It would be at this point, Your Honor.
11   Thank you.
12            THE COURT:  SCS?
13            MS. MORTON:  Yes, Your Honor.  If I may just
14   start by addressing some of the points counsel raised, and
15   then certainly I will address standing and the question of
16   the letter and the other issues that the Court has raised.
17            THE COURT:  Yes, ma'am.
18            MS. MORTON:  I don't -- I'm not going to go as
19   far to say that the plaintiff has conceded that Garcetti
20   applies with respect to the First Amendment complaint.  I see
21   this is two separate distinct causes of action.  We have the
22   First Amendment claim and then we have the 14th Amendment due
23   process claim.
24            THE COURT:  Yes.
25            MS. MORTON:  So with respect to the First
```

**UNREDACTED TRANSCRIPT**

1    Amendment, our position is, as the Court observed in our

2    briefing, is that *Garcetti* and *Evans-Marshall* and some other

3    subsequent cases in the Sixth Circuit control that.  This was

4    not private speech.  It was government speech because as

5    conceded in the -- on the face of the complaint, this

6    principal's message, his words, the principal's message was

7    delivered in his role as principal.  So there's no question

8    as to whether or not this was government speech versus

9    private speech.

10             So all of the arguments related to the First

11    Amendment including the viewpoint discrimination argument

12    plaintiff has made all relates to private speech.  First

13    Amendment protects private speech.  It does not protect

14    government speech.  So with respect to the First Amendment

15    claim, we just don't see any plausible cause of action there.

16             With respect to the due process, the main issue

17    is, with those two cases that he cites, as I think the Court

18    has already observed, is that in both of those cases the

19    individual employees were disciplined for alleged violation

20    of a policy, and that policy was actually applied to him.  So

21    in both those cases we had an allegation that I was

22    disciplined for this policy, this policy is void for

23    vagueness as applied to me.

24             We don't have that here because Principal Thorne

25    was not disciplined.  He does not allege in the complaint

UNREDACTED TRANSCRIPT

1   that he was even accused of violating a policy and certainly

2   not that there was a determination that he violated a policy.

3   And that he wasn't disciplined for that.  There's no pleading

4   to indicate that he was disciplined.

5          With respect to discovery, we have produced the

6   final investigation report which was not -- does not reveal

7   any indication of a punitive nature of the suspension.  It

8   was of course during COVID.  We had employees that were

9   working from home.  Students were able to return to the

10  school building shortly after that so that was a huge

11  priority for the district, making sure that our students had

12  access to their educational needs.

13         Just like with every other government and all

14  citizens, it was a disruption for us as well.  So an

15  investigation that took six weeks in January, February 2021,

16  may not have taken six weeks in another circumstance.  And

17  that's identified in the final report.  As well as tensions

18  were high at that time.

19         Also pled in the complaint is that there were

20  complaints by parents, students or teachers that were

21  received by the district about the message that was given.

22  So as stewards of public funds charged with educating

23  students we have obligations and duties to the students, to

24  their families and to teachers to look into these complaints

25  that were raised.

**UNREDACTED TRANSCRIPT**

1              With respect to --

2         **THE COURT:**  Ms. Morton, may I ask on that?

3         **MS. MORTON:**  Yes.

4         **THE COURT:**  And I don't want to go to meddling,

5    but in the course of discovery or otherwise was Mr. Suhr able

6    to determine who the complainants were and what the nature of

7    the complaints were?  And I ask that in the context you're

8    addressing.  One can either watch the videotape of what

9    Principal Thorne said or read the transcription, it would

10   seem sort of on the spot, and determine whether there has

11   been a sanctionable conduct.

12             So I'm wondering if there was more to it, if

13   there were complaints that he'd done something else or

14   something more.

15        **MS. MORTON:**  To answer the initial question, the

16   complaints -- my understanding is that the complaints were

17   received through an electronic system and they were

18   anonymous.  There's a choice of the complainant to reveal

19   their name or not.  Those were produced in discovery.

20             As it relates to the time of it, the statements

21   were long.  It was about, you know, nine minutes, and there's

22   a lot in there.  So the other reason that was identified in

23   the final report for the time frame of the investigation is

24   that we were receiving messages after that as well about the

25   suspension, the administrative leave, and the comments.

**UNREDACTED TRANSCRIPT**

1    People were upset.  Members of the community were upset on

2    both sides.  So one of the other reasons for it is we wanted

3    to give -- there was a disruption as evidenced by the

4    complaints that were received, and we needed to let that

5    relax a little bit so we could go back to normal and get back

6    to the business of educating our students.

7              **THE COURT:**  Okay.

8              **MS. MORTON:**  Did that answer the Court's

9    question?

10             **THE COURT:**  It does.  It goes to the issue I

11   raise with Mr. Suhr and really sort of for the school

12   counsel's benefit about the admonition in the file.  I mean,

13   if he didn't do anything wrong, if he didn't violate any

14   policies and he wasn't to be disciplined, then what does the

15   school mean by admonishing him that he must be mindful of how

16   his remarks may affect school staff and students?  And what's

17   with encouraging him to participate in a professional

18   development program?  It sounds like he did something wrong.

19             **MS. MORTON:**  Well, there is no dispute that we

20   received complaints about the message.  So at a minimum,

21   other people in the community were affected by this.  So

22   regardless of whether or not there was a policy that was

23   violated that warranted discipline, there was a disruption

24   that was caused.  And the constituents of the school district

25   and possibly students of Principal Thorne, parents, educators

**UNREDACTED TRANSCRIPT**

1    in his school were bothered by this such that they submitted

2    complaints about it.

3            So whether or not a policy was violated -- you

4    know, we have never said that he did anything wrong, but we

5    all have opportunities to grow in our jobs, and I think

6    that's all that that was intended to be.

7            And I would also, if the Court would permit,

8    address the issue of the report to the state --

9            **THE COURT:**  Yes.

10           **MS. MORTON:**  -- with regard to standing.  So the

11   first point I'll make is that there's no allegation in the

12   complaint that it was reported to the state.  And my

13   understanding, Your Honor, is that it was not reported to the

14   state.  There are state board rules that govern when a

15   director of schools, a superintendent is required to report

16   administrative leave pending an investigation for certain

17   types of alleged wrongdoing.  My understanding is that this

18   did not fall within that and that it was not reported.  And

19   that, I believe, is the way we answered our request for

20   admission in discovery as to that issue.

21           As to standing, our position is similar to the

22   position that we're taking in to the substantive claims which

23   is that there's no harm here.  There's no injury in fact.

24   That's a requirement for standing.  There's no injury here.

25   He didn't lose any pay.  He didn't lose any benefits,

**UNREDACTED TRANSCRIPT**

1   anything like that.  And particularly if we're looking at the

2   due process claim, due process is a deprivation of life,

3   liberty, or property, and there's no allegation of any

4   property interest that was lost as a result of any policy

5   that wasn't even applied to him.

6         So with regard to standing, it would also be our

7   position that there is no injury in fact, and that is the

8   same reason that the claims fall -- fail generally, including

9   the state law breach of contract claim.  Also, there's no

10  damages which is, of course, an essential element of a breach

11  of contract claim under Tennessee law.

12        **THE COURT:**  You know, if the Court were to

13  proceed further and if the Court were to determine that there

14  were no First Amendment nor 14th Amendment claims, the

15  contract claims would be pendent.  And without the Court

16  weighing in on those, because I really don't have any

17  information about those, whatever the Court might do could be

18  done without prejudice, and the defendant would still have

19  some right in some other form perhaps to pursue that.  I'm

20  not weighing in on it.

21        You mentioned a few important factors here that

22  sort of flavor these proceedings, and that is the school's

23  sensitivity to the school's constituency, if you will.  You

24  didn't use that term but -- and you may feel free to be

25  seated as well.  You don't have to stand.

**UNREDACTED TRANSCRIPT**

1          You know, you had COVID underway, you -- these

2     are my words, not yours.  You didn't want to appear to be

3     insensitive to the feelings of the community that may have

4     been on various sides of various issues.  What Principal

5     Thorne said is in the eye of the beholders.  And that's what

6     free speech is all about because what they may have

7     understood him to say under normal circumstances might

8     promote further discussion to say, well, that's what I meant

9     or, well, that's not what I was addressing.  I was addressing

10    a different aspect.

11         You know, some people this was about censorship.

12    Other people, this was about more current events.  It

13    depends.  And that's really what free speech is designed to

14    promote, is that kind of dialogue.  So it's a difficult

15    reality.

16         Just as the schools don't want to appear to have

17    been insensitive, the Court doesn't want to appear to be

18    insensitive or certainly indifferent to the realities of what

19    we're talking about here, the context in which it arises,

20    which is another reason I wanted to see you and hear from you

21    personally because it's a very important -- it's a very

22    important issue.

23         Sometimes given the constraints within which

24    district courts must operate, must function, it may appear to

25    others perhaps, if not the parties themselves, that the

**UNREDACTED TRANSCRIPT**

1   courts are rather mechanical in their resolution of these

2   matters.  So I think it's clear to all involved here that the

3   mechanics notwithstanding, we understand the importance of

4   the issues to the schools and also to the plaintiff in this

5   case.  What's to be done about it in the context of a public

6   employee doing what he's required to do under Sixth Circuit

7   precedent is another thing.

8           So you've all completed discovery?

9           **MR. SUHR:**  I think, yes, basically, Your Honor.

10          **MS. MORTON:**  We have raised some issues with

11  plaintiff with regard to the sufficiency of document

12  production, in particular text messages and e-mails and other

13  communications, and we may have some issues with respect to

14  whether that's been properly preserved, but that's -- we

15  don't plan on -- other than following up on prior requests,

16  then I would say we're complete.

17          **THE COURT:**  All right.  Mr. Suhr, anything in

18  response to that or anything else?

19          **MR. SUHR:**  Yeah, actually a few points if I may.

20  So I wouldn't say we concede the First Amendment claim here,

21  Your Honor, and that's because I think the First Amendment

22  incorporates a fair notice component when speech is being

23  disciplined.

24          So there's a First Circuit case that we site in

25  our brief from 1993.  The name escapes me.  But the First

**UNREDACTED TRANSCRIPT**

1    Circuit decides a very similar case involving a teacher

2    actually not as a due process 14th Amendment claim but as a

3    First Amendment claim.  The underlying principle is the same

4    that you're entitled to fair notice about whether your speech

5    will be punished.

6            And actually, there's a Sixth Circuit case from

7    the 1970s that we mention as well.  Obviously, it's an older

8    case, but the teacher there had taught out of the sex ed

9    curriculum and was disciplined for it, and that was a First

10   Amendment holding as well.

11           I think that's important, Your Honor, because if

12   the school district were to convince you that there's not a

13   liberty or property interest here, the fact that the First

14   Amendment claim survives would then provide an alternative

15   basis for moving towards summary judgment.

16           **THE COURT:**  Of course, in addition or in the

17   alternative, there may be an interest here but it hasn't been

18   violated, would be the school's position, that there was no

19   adverse employment action, per se.  Your position -- and I

20   think you cited -- I know you did from some other circuits

21   but I think you have some unreported decisions in the Sixth

22   Circuit, three or four, that you said this would amount, the

23   fact that he was suspended, although with pay, for six weeks

24   and the letter was put in his file, it's your contention that

25   amounts to an adverse employment action.

**UNREDACTED TRANSCRIPT**

1          **MR. SUHR:**  That's correct, Your Honor.  Those

2    Sixth Circuit cases, you're right, it's from an F appendix as

3    I'm remembering in reading it on the plane yesterday.  I

4    think basically when a paid investigation is undertaken in a

5    way that is not promptly resolved and for ulterior motives to

6    an authentic investigation, that investigation can constitute

7    an adverse employment action.  And that makes sense obviously

8    because the professional representational damage that can

9    come from being put on paid leave is substantial, especially

10   when it's done in a way that is not justified by the facts.

11   And I think that's actually an important point as well.

12          SCS's counsel made the comment about the

13   obligation to investigate these complaints.  And there

14   certainly is an obligation to investigate the complaint, but

15   it is different from an obligation to place Mr. Thorne on

16   paid leave.  If you read SCS's own progressive discipline

17   handbook, paid leave is reserved for the most serious

18   allegations, something like sexual assault of a student or

19   sexual harassment of a staff member where your presence in

20   the school building is the sort of threat that even if, you

21   know, we find out the allegation is totally false, we have to

22   take you out of the school building setting in order to keep

23   everybody safe.  That's what paid leave is reserved for in

24   their own handbook.

25          Obviously, what happened here where we're talking

**UNREDACTED TRANSCRIPT**

1    about speech about a political matter, or allegedly political

2    speech, we think obviously just teaching social studies

3    standards, but regardless, like it doesn't rise to SCS's own

4    definition of when paid leave would be appropriate.  And I

5    think that really reduces to my most important point in this

6    area which is that SCS is not responding to outside

7    constituents and complaints.

8              SCS's board member is going on local television

9    the day after saying that Principal Thorne does not represent

10   SCS values, and a senior member of the SCS administration,

11   the director of equity, is going on local television and

12   saying that Principal Thorne is not respecting the racial

13   diversity of SCS schools.

14             **THE COURT:**  So Ms. Morton, is that so?  I mean,

15   what is -- is that true?  Did that happen?

16             **MS. MORTON:**  There were comments made by one

17   board member and then by the director of equity.  I would

18   mention that the board member is speaking certainly as a

19   citizen.  She's an elected official, not an employee of the

20   district, so I think those are distinct things.

21             **THE COURT:**  So she has First Amendment rights as

22   well as, you would say, actions that couldn't be imputed to

23   you?

24             **MS. MORTON:**  Yes.

25             **THE COURT:**  Okay.

**UNREDACTED TRANSCRIPT**

1          **MS. MORTON:**  Yes.  I mean, there were comments

2    made in response to media inquiries.

3          **THE COURT:**  And also I'm -- forgive me, but does

4    Memphis Shelby County Schools contend in any respect that

5    this has anything to do with race?

6          **MS. MORTON:**  No.  No.  I mean, you know, we've

7    given our position which is that the leave was for the

8    purpose of investigating complaints that we received, at

9    least insofar as that there was any violation of policy.

10          **THE COURT:**  All right.  Okay.

11          **MS. MORTON:**  If I may, may I respond to the

12    argument with respect to the --

13          **THE COURT:**  Adverse employment action?

14          **MS. MORTON:**  Yeah, the limitations on the

15    investigation.

16          **THE COURT:**  Yes.

17          **MS. MORTON:**  So I disagree with the

18    characterization.  I'm not certain which cases he's talking

19    about, but I think counsel is talking about *Thompson* and

20    *Salem v* -- *City of Salem*.  I have not seen any case cited by

21    counsel or in my own research that holds that there is some

22    sort of time limitation on investigation of possible

23    wrongdoing.  What those cases say is that there were

24    investigations that were done.

25          One of them, the investigation closed, then there

**UNREDACTED TRANSCRIPT**

1    was a suspension following that.  So the facts of those cases

2    are not the same thing, and they cannot be fairly read to say

3    that there's a time limitation on an investigation.  And that

4    is not conducive to the interests that *Garcetti* is

5    protecting, which is that a government employer has the right

6    to direct words and actions and for the purpose of creating

7    efficient public service through the services that the

8    government provides.

9         And with respect to the concept of a good faith

10   requirement, the Sixth Circuit case *Kuhn v. Washtenau*, 708

11   F.3d 612, specifically rejects an argument that if there is a

12   bad faith issue, that there's a good faith requirement with

13   respect to it.

14        So certainly the district's position is that

15   everything was done in good faith.  There was no -- the

16   administrative leave was done for the purpose of

17   investigation in response to complaints.  It was not punitive

18   in any way.  But there is no support in the law, at least in

19   the Sixth Circuit, that would impose some sort of good faith

20   requirement on the front end or impose a time limitation on

21   it.

22        And the other thing I just want to go back to, if

23   it's okay, is that in the reinstatement letter, what that was

24   is an opportunity for Principal Thorne to reflect on his role

25   and to, as I said before, grow in his -- in his employment.

**UNREDACTED TRANSCRIPT**

1    It was not an admonishment.  It was not a warning.  A warning

2    suggests that if this happens again other disciplinary action

3    will be taken, and that's not what the letter says.  It's

4    purely feedback and an opportunity for Barton Thorne.

5              **THE COURT:**  Then allow me to ask why does the

6    reinstatement letter remain in his file?

7              **MS. MORTON:**  There are two files that are

8    maintained.  Of course, we do have a duty to the public as

9    well to keep records and to make those available.  The file

10   with our Office of Professional Standards includes all of the

11   documents that are related to the investigation, including

12   the final report that finds no wrongdoing and the

13   reinstatement letter as well.

14             So it's in the file because it's part of an

15   investigation that was conducted by the Office of

16   Professional Standards.

17             **THE COURT:**  So what -- all right.  What purpose

18   does that serve under these circumstances, under these facts?

19   Yes, you did all of that, but you found it was unnecessary.

20             **MS. MORTON:**  It's the way that we keep records,

21   and we're keeping records of an investigation that was

22   performed.  So it's for his protection as well.  It's for the

23   benefit of the employee as well.  When we conduct

24   investigations in the Office of Professional Standards, we

25   keep a record what we do just like we keep a personnel file

**UNREDACTED TRANSCRIPT**

1   and we keep a record of other types of things.

2                THE COURT:  Okay.  Thank you.  Unless you have

3   anything else to offer, you have answered my questions.  I

4   appreciate your time and attention, and we'll rule soon.

5   Thank you.

6                MR. SUHR:  Thank you, Your Honor.

7                THE COURT:  Thanks for coming.

8                MR. WATSON:  Thank you, Your Honor.

9                     (Adjournment at 10:49 A.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNREDACTED TRANSCRIPT**

34

# C E R T I F I C A T E

I, LISA J. MAYO, do hereby certify that the
foregoing 33 pages are, to the best of my knowledge, skill
and abilities, a true and accurate transcript from my
stenotype notes of the MOTION HEARING on the 17th day of
February 2022, in the matter of:


BARTON THORNE

vs.

SHELBY COUNTY BOARD OF EDUCATION


Dated this 18th day of April 2025.




                           S/Lisa J. Mayo

                     LISA J. MAYO, RDR, CRR
                     Official Court Reporter
                     United States District Court
                     Western District of Tennessee




**UNREDACTED TRANSCRIPT**